IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| EXXON MOBIL CORPORATION and XTO ENERGY INC. | § § § | CASE NO. _____ |
| Plaintiffs, | § § | |
| vs. | § § | JURY TRIAL DEMANDED |
| JOSHUA PRASATIK, LARRY HUTCHINS, JOSEPH MICHAIEL, and ICON MINERALS LIMITED LIABILITY COMPANY | § § § § | |
| Defendants. | § § | |

**PLAINTIFFS' VERIFIED ORIGINAL COMPLAINT AND
APPLICATION FOR A TEMPORARY RESTRAINING ORDER,
PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION**

Plaintiffs Exxon Mobil Corporation ("Exxon Mobil") and XTO Energy Inc. ("XTO" and, collectively with Exxon Mobil, the "Plaintiffs") submit this Verified Original Complaint seeking temporary, preliminary, and permanent injunctive relief, as well as monetary damages, against Defendants Icon Minerals Limited Liability Company ("Icon Minerals"), Joshua Prasatik, Larry Hutchins, and Joseph Michaiel (collectively, "Defendants"). Plaintiffs' grounds for a temporary restraining order are also set forth in its Verified Motion for a Temporary Restraining Order, filed contemporaneously herewith.

### I. Overview of the Lawsuit

1.      Defendant Joshua Prasatik is a licensed Texas lawyer. Since being hired in 2011, Mr. Prasatik has worked for Plaintiffs as a Property and Title Analyst, which is akin to a landman. In his most recent role, Mr. Prasatik's responsibilities included acquiring property interests in areas of New Mexico that Plaintiffs had targeted for current and future development (i.e., drilling and production).

2.      In connection with his employment, Plaintiffs entrusted Mr. Prasatik with Plaintiffs' confidential information and trade secrets, including confidential information regarding: (a) Plaintiffs' current and future development plans; (b) Plaintiffs' royalty interest owners; and (c) legal forms and templates used by Plaintiffs to acquire real property interests.  Mr. Prasatik was required to keep this information confidential pursuant to the terms of his employment and his ethical obligations as a Professional Landman and as a Texas lawyer.

3.      In 2025, Plaintiffs discovered that Mr. Prasatik and his co-Defendants had misappropriated Plaintiffs' confidential information and trade secrets and were using it to benefit themselves at Plaintiffs' expense.  The investigation is in its preliminary stages but has already revealed substantial cause for concern.  For example, Plaintiffs discovered that Mr. Prasatik used information regarding Plaintiffs' royalty owners to identify royalty interests in suspense or escheat status,[1] and then acquired (or attempted to acquire) those royalty interests on behalf of Defendant Icon Minerals.  Defendant Hutchins formed Icon Minerals to assist in executing this scheme, and his address is included on at least one of the conveyance documents in which Icon Minerals acquired interests from one of Plaintiffs' royalty interest owners.  Defendant Michaiel prepared an economic and cash flow model to assist the Defendants in valuing an interest they were seeking to acquire from one of Plaintiffs' royalty interest owners, and he also reviewed and revised a draft offer for Icon Minerals to purchase at least one such interest.

4.      As another example, Mr. Prasatik obtained a spreadsheet with detailed information

---

[1] A royalty interest is typically placed in suspense or escheat status due to title issues.  For example, if a royalty interest owner passes away, it may take some time for the heir to be established.  During the period of unclear ownership, Plaintiffs will accrue and hold the royalty payments in a suspense account until ownership is established (at which point, the suspended royalties are paid to the newly established owner of the interest).  If a royalty interest is held in suspense for a prolonged period, applicable laws (which vary based on the jurisdiction) may ultimately require that the suspended royalty payments escheat to the government.

regarding Plaintiffs' current and future development plans. The information in this spreadsheet is confidential and valuable, as it could be used to acquire mineral and/or royalty interests in areas targeted for future development before those development plans were known to the public and factored into the market value of the interests. This information could also be used by third parties (including Plaintiffs' competitors) to acquire interests in or adjacent to those areas that Plaintiffs had targeted for development and make it difficult (if not impossible) for Plaintiffs to execute their plans, and then seek to leverage their position to extract above market value for the interests. After obtaining this spreadsheet, Mr. Prasatik named it "Retire~" and forwarded it from his company email address to his personal email address.

5.      Plaintiffs attempted to interview Mr. Prasatik to better understand the scope of the Defendants' scheme. Mr. Prasatik initially denied doing anything improper but—when confronted with evidence to the contrary—acknowledged that he (and others that he refused to identify) had acquired interests from one of Plaintiffs' royalty owners and then ended the interview. Mr. Prasatik then skipped a follow-up interview and was terminated by Plaintiffs.

6.      Defendants' misconduct has resulted in actual, monetary damages to Plaintiffs. Moreover, Defendants continue to possess Plaintiffs' confidential information and trade secrets which—absent injunctive relief—poses an imminent threat of irreparable harm for which there is no adequate remedy at law including, without limitation, undermining relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to Plaintiffs' reputation.

7.      Accordingly, Plaintiffs ask the Court to issue injunctive and other relief as necessary and appropriate to prevent further damages and injuries to Plaintiffs.

## II.  Parties

8.    Plaintiff Exxon Mobil Corporation (as previously defined and referred to herein as "Exxon Mobil") is a corporation organized under the laws of New Jersey with its principal place of business in Texas.

9.    Plaintiff XTO Energy Inc. (as previously defined and referred to herein as "XTO") is a corporation organized under the laws of Delaware with its principal place of business in Texas.

10.    Defendant Joshua Prasatik is an individual who resides in Harris County, Texas who may be served with process at his residence located at 5410 Edith St., Houston, Texas 77096 and/or through his counsel, Matt Hennessy at Gerger Hennessy Martin & Peterson, 700 Louisiana, Suite 2300, Houston, Texas 77002.

11.    Defendant Larry Hutchins is an individual who resides in Harris County, Texas who may be served with process at his residence located at 3515 Durness Way, Houston, Texas 77025.

12.    Defendant Joseph Michaiel is an individual who resides in Harris County, Texas who may be served with process at his residences located at 3714 Sun Valley Drive, Houston, Texas 77025 and 4115 Underwood St., Houston, Texas 77025.

13.    Defendant Icon Minerals Limited Liability Company (as previously defined and referred to herein as "Icon Minerals") is a limited liability company organized under the laws of Texas with its principal place of business in Texas, which may be served with process through its Registered Agent, Larry Hutchins, 3515 Durness Way, Houston, Texas 77025.

## III.  JURISDICTION & VENUE

14.    The Court has personal jurisdiction over Defendants Prasatik, Hutchins, and Michaiel, all of whom are residents of Harris County, Texas.

15.    The Court also has personal jurisdiction over Defendant Icon Minerals, which is a limited liability company organized under Texas law with its principal place of business in Texas.

16.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (i.e., federal question jurisdiction), as Plaintiffs assert claims arising under the laws of the United States, namely, the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* The Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 as the state law claims are so related to Plaintiffs' federal claim that the state law claims form part of the same case or controversy under Article III of the United States Constitution.

17.    Venue in this district is proper because all Defendants are residents of Texas and reside in this district. *See* 12 U.S.C. § 1391(b)(1). Venue is also proper in this district because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district. *Id.* § 1391(b)(2).

## IV.   PERTINENT FACTS

**A.    Prasatik is hired in 2011, agrees to be bound by Plaintiffs' policies regarding confidential information and conflicts of interest, and receives access to Plaintiffs' confidential information and trade secrets.**

18.    Plaintiff Exxon Mobil is a multinational petrochemical company. Plaintiff XTO is a wholly owned subsidiary of Exxon Mobil that produces oil and gas primarily in North America.

19.    Defendant Joshua Prasatik is a Texas lawyer who has worked for Plaintiffs since being hired in 2011. Ex. 1 ¶ 3.

20.    Upon being hired, Mr. Prasatik executed an Intellectual Property Agreement. *Id.* ¶ 4; Ex. 1-A. Pursuant to the Intellectual Property Agreement, Mr. Prasatik agreed that—except as required for his job—he would "never use or disclose, either during or after my employment, confidential information held or used by [Exxon Mobil] or its affiliates[.]" Ex. 1-A p. 1.

21.     Mr. Prasatik also completed an Annual Compliance Statement during each year of his employment.  Ex. 1 ¶ 5; *see, e.g.,* Ex. 1-B (Mr. Prasatik's Annual Compliance Statement for 2024).  In this Annual Compliance Statement, Mr. Prasatik confirmed that he had read, understood, and complied with ExxonMobil's Standards of Business Conduct.  Ex. 1 ¶ 6; Ex. 1-B p. 2.  Among other provisions, the Standards of Business Conduct contain a Corporate Assets Policy that—similar to the Intellectual Property Agreement—prohibits employees from using or disclosing Plaintiffs' confidential information without proper authorization.  Ex. 1-C p. 5.

22.     The Standards of Business Conduct also contain a Conflicts of Interest Policy that requires employees to avoid actual or apparent conflicts between their own personal interests and Exxon Mobil's interests, and prohibits employees from competing with Plaintiffs or taking for themselves opportunities that they discovered through their employment.  *Id.* p. 7.

23.     In his most recent role, Mr. Prasatik was a Commercial & Land Advisor (a/k/a, a Landman) serving areas located within the Delaware Basin in New Mexico.  Ex. 1 ¶ 8.  Mr. Prasatik's responsibilities included stewarding development activities, acquiring subsurface and royalty interests, researching title and ownership of subsurface and royalty interests, and negotiating commercial transactions with industry competitors and landowners for core assets located in the Delaware Basin of New Mexico that Plaintiffs had targeted for current and future development.  *Id.*  As part of this role, Mr. Prasatik was directly involved with the development, operations, and strategic planning groups and received confidential and valuable information regarding Plaintiffs' current and future development plans.  *Id.*  Mr. Prasatik would then analyze title and ownership issues to identify the owners of property interests in those areas targeted by Plaintiffs for development, and work to acquire from those owners the interests necessary for Plaintiffs to execute the development plans and meet the Plaintiffs' production targets.  *Id.*

24.     In addition, Mr. Prasatik had access to confidential and proprietary information (e.g., title opinions and ownership history) relating to the ownership of property interests in areas that Plaintiffs had already developed and that were still producing oil and/or gas. *Id.* ¶ 9. Mr. Prasatik would also communicate with interest owners in certain developed areas who submitted inquiries to Plaintiffs regarding their interests, and had access to confidential information regarding royalty interests in those areas that were in suspense or escheat status. *Id.*

**B.    A potential royalty interest owner alerts Plaintiffs that Mr. Prasatik contacted him on behalf of Icon Minerals to discuss purchasing his royalty interest.**

25.     In March 2025, an individual (pseudonymously, "John Doe") who potentially owned royalty interests in areas of New Mexico contacted Plaintiffs to inquire about the interests. Ex. 2 ¶ 3. John Doe believed that his father had owned the royalty interests and that—when his father passed away—he became the rightful owner. *Id.*

26.     John Doe spoke with Plaintiffs' Commercial & Land Manager - Midland Basin, Greg Waggener. *Id.* Mr. Waggener referred John Doe to Mr. Prasatik, whose responsibilities included the areas in New Mexico in which the royalty interests were located. *Id.* ¶ 4.

27.     Upon hearing Mr. Prasatik's name, John Doe informed Mr. Waggener that someone named Joshua Prasatik had recently contacted him. *Id.* ¶ 5. John Doe explained that Mr. Prasatik represented that he worked for Icon Minerals and had contacted John Doe to discuss purchasing the royalty interests formerly owned by John Doe's father. *Id.* John Doe also provided a voice mail he had received from Mr. Prastaik, in which Mr. Prasatik provided his name and personal phone number while representing that he worked for Icon Minerals. *Id.* Mr. Waggener confirmed that the phone number in the voicemail is Mr. Prasatik's personal cell phone number. *Id.* ¶ 6.

28.     John Doe also provided Mr. Waggener with emails and text messages he had received from Mr. Prasatik. *Id.* ¶ 7. In one of these emails, Mr. Prasatik (using the email address

iconminerals@outlook.com) told John Doe:

> Icon Minerals, LLC is start-up mineral & royalty company in Houston, TX. Our founders have decades of experience working in the oil & gas industry. We specialize in making attractive purchase offers for mineral and royalty interests including smaller interests with clouds on title that larger mineral buyers may ignore. We can make substantial cash offers to buy with short due diligence periods and quick closings. We also provide services to minerals owners such as assisting with valuation, due diligence, and clearing title to inherited interests.

Ex. 2-A. When John Doe responded by asking Mr. Prasatik for the "name of one of your founders," Mr. Prasatik identified Defendant Larry Hutchins. *Id.* ("Sure thing. Larry Hutchins – 30+ years in the industry, several doing business development work."). *Id.*

**C.    Plaintiffs discover that Mr. Prasatik (working with the other Defendants) had acquired multiple interests from Plaintiffs' royalty owners, was seeking to acquire additional interests from Plaintiffs' royalty owners, and had also sent Plaintiffs' confidential information to his personal email address.**

29.    Upon learning that Mr. Prasatik had contacted one of Plaintiffs' potential royalty owners (John Doe) to discuss purchasing the royalty interest on behalf of Icon Minerals, Plaintiffs initiated an internal investigation. Ex. 2 ¶ 8; Ex. 3 ¶ 3.

30.    Plaintiffs' internal investigation is in its initial stages, and the investigation is limited in that Plaintiffs cannot force Defendants to provide information or produce materials. Although Plaintiffs expect to discover more details regarding Defendants' scheme as the investigation continues, the initial investigation has already revealed several troubling actions committed by Mr. Prasatik and his co-Defendants.

**1.    Plaintiffs discover three royalty interests—all of which were in suspense/escheat status—that were conveyed to Icon Minerals, with the conveyance documents listing addresses associated with all Defendants.**

31.    Plaintiffs' investigation has revealed three royalty interests that were recently conveyed to Icon Minerals. Ex. 3 ¶ 4. All three of these conveyances: (a) involved royalty interests

in areas of New Mexico for which Mr. Prasatik was responsible; (b) conveyed royalty interests that Plaintiffs had placed in suspense or escheat status; and (c) included information associated with Mr. Prasatik and the other Defendants.

32.     The first conveyance to Icon Minerals was executed in December 2024.  Ex. 3 ¶ 4(a); Ex. 3-A.  The conveyance document lists two addresses for Icon Minerals.  Ex. 3-A.  The body of the conveyance document lists Icon Mineral's address as 3714 Sun Valley Drive, Houston, Texas 77025.  *Id.*  Harris County Property Tax Records identify Defendant Joseph Michaiel as owning a residential home at this address on Sun Valley Drive.  Ex. 3 ¶ 4(a); Ex. 3-D.  The conveyance document also includes the following in its footer:

**ICON MINERALS LLC
510 EDITH ST
HOUSTON, TX  77096**

Ex. 3-A.  The address listed in this footer for Icon Minerals—510 Edith St., Houston, Texas 77096—does not exist.  Ex. 3 ¶ 4(a).  Harris County Property Tax Records, however, identify Mr. Prasatik as owning a single-family residence located at a very similar address, 5410 Edith St., Houston, Texas 77096.  *Id.*; Ex. 3-E.  Thus, it appears that the address in the footer was likely intended as 5410 Edith Street, but that the numeral "4" was inadvertently omitted.

33.     The second conveyance to Icon Minerals was executed in January 2025.  Ex. 3 ¶ 4(b); Ex. 3-B.  Here again, the body of the conveyance document lists Mr. Michaiel's address (3714 Sun Valley Dr., Houston, Texas 77025) as the address for Icon Minerals.  Ex. 3 ¶ 4(b); Ex. 3-B.  This second conveyance also includes the following in its footer:

9

```
ICON MINERALS LLC
5410 EDITH ST
HOUSTON, TX  77096
```

Ex. 3-B.  As noted above, Harris County Property Tax Records identify Mr. Prasatik as owning a single-family residence at this same address (5410 Edith St., Houston, Texas 77096).  *Supra* ¶ 32; Ex. 3-E.

34.    The third conveyance to Icon Minerals was executed in February 2025.  Ex. 3 ¶ 4(c); Ex. 3-C.  Here again, the body of the conveyance document lists Mr. Michaiel's address (3714 Sun Valley Dr., Houston, Texas 77025) as the address for Icon Minerals.  Ex. 3 ¶ 4(c); Ex. 3-C.  This third conveyance also includes the following in its footer:

```
ICON MINERALS LLC
3515 DURNESS WAY
HOUSTON TX 77025
```

Ex. 3-C.  The Texas Secretary of State's website identifies the address listed in this footer (3515 Durness Way) as the address for Icon Mineral's registered agent, Defendant Hutchins.  Ex. 3 ¶ 4(c); Ex. 3-F.

35.    Documents submitted to the Texas Secretary of State further establish that Icon Minerals was formed on January 28, 2025, with Defendant Hutchins listed as its Managing Member and Organizer.  Ex. 3 ¶ 4(c); Ex. 3-F.  These same documents list Mr. Hutchins's address as 3515 Durness Way, Houston, Texas 77025 (i.e., the same address as listed for Icon Minerals in the footer of the third conveyance document).  Ex. 3 ¶ 4(c); Ex. 3-F.

36.    Upon discovering these three conveyances to Icon Minerals, Plaintiffs froze all royalty payments associated with the royalty interests.

**2.  Plaintiffs discover emails between Mr. Prasatik and Mr. Michaiel discussing offers to purchase additional mineral and/or royalty interests, including an offer to purchase royalty interests in escheat status.**

37.  Plaintiffs' internal investigation also revealed two email chains between Mr. Prasatik and Mr. Michaiel discussing the acquisition of additional mineral and/or royalty interests. Ex. 3 ¶ 5.

38.  The first email chain is from August 2024 and has the subject line "EF Minerals." Ex. 3-G.  Mr. Michaiel sent the initial email, attaching a "cash flow model" and stating: "From my forecast, the most we want to pay to breakeven at PV15 is $17,900." *Id.*   Mr. Michaiel sent this email to Mr. Prasatik's personal email address (jpprasatik@gmail.com), but Mr. Prasatik forwarded the email to his Exxon Mobil email address. *Id.*

39.  The second email chain is from October 2024 with the subject line "let's discuss." Ex. 3-H.  Mr. Prasatik sent the initial email (using his personal gmail account) to Mr. Michaiel, attaching a "draft offer letter" and inviting discussion regarding same. *Id.*  Mr. Michaiel responded by stating "[m]y inserts" and attaching a redline version of an offer letter. *Id.*  Mr. Prasatik then forwarded the email chain and redline offer letter to his Exxon Mobil email address. *Id.*

40.  The redline offer letter that Mr. Michaiel sent to Mr. Prasatik was an offer by Icon Minerals to purchase certain royalty interests located in New Mexico for $150,000. *Id.*  The letter was directed to an individual who, upon information and belief, is the potential heir to a deceased XTO royalty interest owner whose royalty account had accrued more than $200,000 in royalties that were in escheat status.  Ex. 3 ¶ 5.  The letter listed the home associated with Mr. Michaiel (3714 Sun Valley Dr., Houston, Texas 77025) as the address of Icon Minerals, and identified Mr. Michaiel as Icon Minerals' Managing Member.  Ex. 3-H.  The letter also included a draft Assignment and Conveyance instrument for the individual to execute to assign the royalty interests

to Icon Minerals.  *Id.*

> **3.    Plaintiffs discover that Mr. Prasatik obtained Plaintiffs' confidential and proprietary information and sent it to his personal email account.**

41.    Plaintiffs also discovered that Mr. Prasatik had obtained Plaintiffs' sensitive, confidential, and proprietary information and then sent that information to his personal email account.  Ex. 3 ¶ 6.

42.    In one instance, Mr. Prasatik obtained a spreadsheet with information regarding Plaintiffs' current and future drilling and production plans, including details regarding the areas to be developed and the timing of that development.  *Id.* ¶ 6(a); Ex. 3-I.  This information is confidential and valuable, and could have been misused by Mr. Prasatik (and the other Defendants) to acquire mineral and/or royalty interests in areas targeted by Plaintiffs for future development before those development plans were known to the public and factored into the market value of the interests.  Ex. 3 ¶ 6(a).  After obtaining this spreadsheet, Mr. Prasatik re-named it "Retire~" and forwarded it to his personal email account.  *Id.*; Ex. 3-I.[2]

43.    In another instance, Mr. Prasatik generated a report from Plaintiffs' SAP system, which report contained detailed information regarding Plaintiffs' royalty interest accounts that were in suspense or escheat status.  Ex. 3 ¶ 6(b); Ex. 3-J.  The information in this report is confidential and proprietary and could have been misused by Mr. Prasatik (and the other Defendants) to identify royalty interests in suspense or escheat status and then seek to purchase

---

[2]  Exhibits 3-I and 3-J (discussed in Paragraphs 42 and 43) include the emails that Mr. Prasatik sent to his personal email account, along with partial excerpts from the attachments to those emails, which excerpts have been redacted to preserve Plaintiffs' confidential and proprietary information.  Ex. 3 ¶ 6(a), (b).  Exhibits 3-K and 3-L (discussed in Paragraph 44) include the emails that Mr. Prasatik sent to his personal email account but do not include the attachments to those emails, as the attachments include Plaintiffs' confidential and proprietary information that cannot be readily protected through redactions.  Ex. 3 ¶ 6(c).  If necessary, Plaintiffs can file the full version of these attachments under seal or make them available to the Court for an *in camera* inspection.

those interests.  *Id.*  After downloading this report, Mr. Prasatik emailed it to his personal email account.  *Id.*; Ex. 3-J.

44.    In other instances, Mr. Prasatik misappropriated legal documents that Plaintiffs created and used to acquire mineral and/or royalty interests.  Ex. 3 ¶ 6(c).  For example, Mr. Prasatik obtained an XTO offer letter and proposed Assignment of Oil and Gas Leases that involved geographic areas for which he had no current responsibilities.  *Id.*; Ex. 3-K.  As another example, Mr. Prasatik obtained a legal template for a Purchase and Sale Agreement that Plaintiffs use to purchase property interests.  Ex. 3 ¶ 6(c); Ex. 3-L.  All of these documents contain Plaintiffs' confidential and proprietary information and could have been misused by Mr. Prasatik (and the other Defendants) in drafting their own offers to purchase property interests.  Ex. 3 ¶ 6(c).  After obtaining these legal documents, Mr. Prasatik emailed them to his personal email account.  Ex. 3 ¶ 6(c); Exs. 3-K, 3-L.

> **4.    Mr. Prasatik initially denied doing anything improper but—when confronted with evidence to the contrary—acknowledged acquiring interests from one of Plaintiffs' royalty owners before ending the interview, and his employment was terminated after he failed to return for a follow-up interview.**

45.    On March 25, 2025, Mr. Prasatik was interviewed by two members of Plaintiffs' internal audit group at Plaintiffs' headquarters in Spring, Texas.  Ex. 3 ¶ 7.

46.    During this interview, Mr. Prasatik was asked if he had any business interests outside of his employment with Plaintiffs, or whether he works for any businesses other than Plaintiffs.  He responded that he did not.  *Id.* ¶ 7(a).

47.    Mr. Prasatik was also asked whether he had ever communicated with Plaintiffs' royalty interest owners on behalf of someone other than Plaintiffs.  He once again responded that he had not.  *Id.* ¶ 7(b).

48.    At that point, the interviewers played Mr. Prasatik the voicemail he left for John

Doe, in which Mr. Prasatik stated that he was calling on behalf of Icon Minerals to discuss purchasing John Doe's royalty interest. *Id.* ¶ 7(c); *see supra* ¶ 27. After listening to approximately 10 seconds of the voicemail, Mr. Prasatik acknowledged that he had communicated with John Doe. Ex. 3 ¶ 7(c).

49.    Mr. Prasatik was then asked whether he had negotiated any purchases of royalty interests on behalf of anyone other than Plaintiffs from any persons or entities to whom the Plaintiffs pay (or accrue) royalties. *Id.* ¶ 7(d). Mr. Prasatik responded that "we" helped a woman clear title to a royalty interest that had been held by her deceased grandfather, which interest had been placed in suspense status by Plaintiffs. *Id.* Mr. Prasatik further explained that—in exchange—"we" received a "small percentage" of the royalty interest. *Id.* The interviewers asked Mr. Prasatik who was included in "we." *Id.* He initially declined to respond, but later indicated that he was part of a group that did not include any other persons employed by Plaintiffs. *Id.*

50.    Mr. Prasatik then stated that—while he was willing to cooperate—he needed time to gather his thoughts before continuing with the interview. *Id.* ¶ 7(e). He refused to answer any more questions, but agreed to resume the interview the following morning at 8:00 a.m. *Id.*

51.    Mr. Prasatik did not appear for the follow-up interview. *Id.* ¶ 7(f).

52.    Plaintiffs terminated Mr. Prasatik's employment on March 31, 2025 (*id.* ¶ 8) and have been informed that Mr. Prasatik is now represented by legal counsel.

**D.    Following his termination, Plaintiffs discover a notebook left by Mr. Prasatik that contains more notes and information regarding the Defendants' scheme.**

53.    After Mr. Prasatik's employment was terminated, Plaintiffs discovered a notebook he had left at the office. Ex. 3 ¶ 9. Although the handwritten notes are somewhat cryptic, the notebook provides additional details regarding Defendants' scheme.

54.    For example, one of the pages in the notebook includes the following notes:

* Working leads; primary focus is delaware Basin – open to others; looking for suspended properties or lost heirs that need a little TLC

* Several in the works; near term leads (i.e., ~ 3 yrs developed) 10 net acres of untapped ORRIs w/ more to come

* Need sources of funding

* Structure of funding

* Top professional

* Resources

suspense, non producing; escheat

Ex. 3 ¶ 9; Ex. 3-M.  These notes confirm that Defendant Prasatik was actively seeking to identify Plaintiffs' royalty owners whose accounts were in suspense or escheat status with the aim of purchasing the royalty interests from those owners.  These notes further confirm that Mr. Prasatik was seeking funding for this scheme and also suggest that Prasatik may have been looking to partner with a "top professional" to execute the scheme.

55.    As another example, one of the pages in the notebook discusses forming Icon Minerals and making an offer to purchase a royalty interest with "199K in suspense."  Ex. 3-M. These notes confirm that Mr. Prasatik was not only seeking to acquire interests from Plaintiffs' royalty owners on behalf of Icon Minerals, but was also involved with the formation of Icon Minerals.

56.    Other notes detail Mr. Prasatik's efforts to establish the chain of title for Plaintiffs' royalty owners.  For example, two pages in the notebook apparently analyze the chain of title to John Doe's royalty interest.  *Id.*  These notes confirm that Mr. Prasatik performed the due diligence to identify John Doe's royalty interest and then, as discussed above (*supra* ¶¶ 25-28), attempted to acquire John Doe's royalty interest on behalf of Icon Minerals.

## V.  CAUSES OF ACTION

**A.    Misappropriation of Trade Secrets under the federal Defend Trade Secrets Act ("DTSA," 18 U.S.C. § 1836 *et seq.*)—All Defendants**

57.    Plaintiffs incorporate Paragraphs 1 - 56 as if set forth in full.

58.    In connection with his employment, Mr. Prasatik had access to Plaintiffs' valuable and confidential trade secrets, including information relating to Plaintiffs' current and future development plans, royalty interest owners, and legal contracts/forms.  These trade secrets involve interstate commerce—e.g., strategic planning and research conducted in Texas to develop oil and gas producing properties in New Mexico, which oil and gas is then transported to markets throughout the country.  Likewise, Plaintiffs use their legal contracts/forms for transactions throughout the country, and issue royalty payments to royalty owners located in multiple states.

59.    Plaintiffs devote substantial time and expense toward protecting the confidentiality of their trade secret information, which information is not generally known in the industry or otherwise available to the public.  Ex. 1 ¶ 10.  For example, Plaintiffs require all employees to maintain the confidentiality of their trade secrets.  *Id.*  This requirement is memorialized in at least two places: Plaintiffs' Intellectual Property Agreement (which Mr. Prasatik executed) and the Corporate Assets Policy (which—as he attested to on an annual basis—Mr. Prasatik had read and understood).  *Id.*; *supra* ¶¶ 20 - 22; Exs. 1-A, B, & C.  As another example, Plaintiffs require the use of passwords (or similar safeguards) to access certain trade secret information and/or restrict authorized access to limited groups of employees.  Ex. 1 ¶ 11.  Plaintiffs also impose physical safeguards that limit employees' ability to obtain Plaintiffs' confidential information, such as providing employees with laptops that are not compatible with external storage devices (e.g., thumb drives), limiting the size of attachments to external emails, and restricting the use of filing sharing websites to certain vendors that have been approved by management.  *Id.*  And, as a final

example, Plaintiffs enforce these policies, requirements, and safeguards by imposing disciplinary measures on employees who improperly use and/or disclose the Plaintiffs' trade secret information. *Id.*

60.     Plaintiffs' trade secrets have substantial actual and potential value to third parties. *Id.* ¶ 12.  For example, oil and gas development in a particular area tends to increase property values in that area.  *Id.*  Thus, a third-party with advance knowledge of Plaintiffs' confidential future development plans could acquire property interests in areas of future development, with the reasonable expectation that the value of those interests would likely increase when the development plans were made public.  *Id.*  Likewise, competing companies (e.g., Icon Minerals) could acquire these interests in areas of future development and make it difficult (if not impossible) for Plaintiffs to execute their development plans, and then seek to leverage their position to extract above market value for the interests.  *Id.*  As another example, confidential information regarding Plaintiffs' royalty interest accounts in suspense or escheat status could be used to acquire those interests for less than fair value from royalty owners who had no understanding that their interests had accrued unpaid royalties (*id.* ¶ 13)—e.g., Icon Mineral's draft offer to purchase a royalty owner's interest for $150,000, when that royalty interest had over $200,000 in accrued and unpaid royalties (*supra* ¶¶ 39-40).

61.     Defendants have maliciously and willfully misappropriated Plaintiffs' trade secrets within the meaning of 18 U.S.C. § 1839(5) by wrongfully acquiring, retaining, transmitting, and using said trade secrets without authorization for their own benefit and/or for the benefit of others. For example, Mr. Prasatik knowingly acquired Plaintiffs' trade secrets by improper means (e.g., in breach of the Intellectual Property Agreement, Corporate Assets Policy, Conflicts of Interest Policy, his statutory and common law duties to Plaintiffs, and his ethical obligations as a Texas

lawyer) and used and disclosed those trade secrets to his co-Defendants without Plaintiffs' consent. Defendants Michaiel, Hutchins, and Icon Minerals also acquired Plaintiffs' trade secrets through Mr. Prasatik and knew or had reason to know that Mr. Prasatik had acquired these trade secrets through improper means. Defendants Michaiel, Hutchins, and Icon Minerals then used these trade secrets without Plaintiffs' consent.

62.    Defendants' actions in misappropriating Plaintiffs' trade secret information and using that information for their own financial benefit were willful, wanton, and malicious, and conducted with reckless disregard for Plaintiffs' rights.

63.    As a direct and proximate result of the Defendants' misappropriation of Plaintiffs' trade secrets in violation of the DTSA, Plaintiffs have suffered irreparable harm for which there is no adequate remedy at law (including, without limitation, damage to the relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to Plaintiffs' reputation). Accordingly, Plaintiffs seek injunctive relief to prevent Defendants from further possessing, disclosing, or using Plaintiffs' trade secrets.

64.    Plaintiffs also seek disgorgement of all profits, compensation, gains, and assets—including real property interests—that Defendants received as a result of misappropriating Plaintiffs' trade secrets, plus all other remedies available under the DTSA including actual damages, attorneys' fees, punitive and exemplary damages, unjust enrichment, costs, and interest.

**B.    Misappropriation of Trade Secrets under the Texas Uniform Trade Secrets Act ("TUTSA," Tex. Civ. Prac. & Rem. Code § 134A.001 et seq.)—All Defendants**

65.    Plaintiffs incorporate Paragraphs 1 - 64 as if set forth in full.

66.    In connection with his employment, Mr. Prasatik had access to Plaintiffs' valuable and confidential trade secrets, including information relating to Plaintiffs' current and future development plans, royalty interest owners, and legal forms/templates.

67.     Plaintiffs have taken reasonable steps to maintain the confidential nature of these trade secrets.  *Supra* ¶ 59; Ex. 1 ¶ 11.

68.     Defendants maliciously and willfully misappropriated Plaintiffs' trade secrets within the meaning of Tex. Civ. Prac. & Rem. Code § 134A.002(3).  For example, Mr. Prasatik knowingly acquired Plaintiffs' trade secrets by improper means means (e.g., in breach of the Intellectual Property Agreement, Corporate Assets Policy, Conflicts of Interest Policy, his statutory and common law duties to Plaintiffs, and his ethical obligations as a Texas lawyer) and used and disclosed those trade secrets to his co-Defendants without Plaintiffs' consent.  Defendants Michaiel, Hutchins, and Icon Minerals also acquired Plaintiffs' trade secrets through Mr. Prasatik and knew or had reason to know that Mr. Prasatik had acquired these trade secrets through improper means.  Defendants Michaiel, Hutchins, and Icon Minerals then used these trade secrets without Plaintiffs' consent.

69.     As a direct and proximate result of the Defendants' misappropriation of Plaintiffs' trade secrets in violation of the DTSA, Plaintiffs have suffered irreparable harm for which there is no adequate remedy at law (including, without limitation, damage to the relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to Plaintiffs' reputation).  Accordingly, Plaintiffs seek injunctive relief to prevent Defendants from further possessing, disclosing, or using Plaintiffs' trade secrets.

70.     Plaintiffs also seek disgorgement of all profits, compensation, gains, and assets—including real property interests—that Defendants received as a result of misappropriating Plaintiffs' trade secrets, plus all other remedies available under the TUTSA including actual damages, attorneys' fees, punitive and exemplary damages, unjust enrichment, costs, and interest.

C.    **Breach of Fiduciary Duty—Defendant Prasatik**

71.    Plaintiffs incorporate Paragraphs 1 - 70 as if set forth in full.

72.    As an employee of Plaintiffs, Defendant Prasatik owed fiduciary duties to Plaintiffs. This fiduciary duty required that Mr. Prasatik act in Plaintiffs' interest, and prohibited him from misappropriating Plaintiffs' trade secrets, competing against the Plaintiffs, and/or using the Plaintiffs' confidential information for his own personal gain.

73.    As detailed herein, Mr. Prasatik breached this fiduciary duty by misappropriating Plaintiffs' trade secrets (e.g., information regarding Plaintiffs' future production plans and royalty interest owners), competing with Plaintiffs (e.g., by acquiring or seeking to acquire mineral/royalty interests in areas that Plaintiffs' had targeted for future development), and using Plaintiffs' confidential trade secrets for his own personal gain (e.g., by acquiring interests held by Plaintiffs' royalty owners that were in suspense or escheat status).

74.    As a direct and proximate result of Mr. Prasatik's breach of his fiduciary duties, Plaintiffs have suffered irreparable harm for which there is no adequate remedy at law (including, without limitation, damage to the relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to Plaintiffs' reputation). Accordingly, Plaintiffs seek to prevent Mr. Prasatik from continuing to breach his fiduciary duties through injunctive relief to prevent Mr. Prasatik from possessing, disclosing, or using Plaintiffs' trade secrets, competing with Plaintiffs, or using Plaintiffs' confidential trade secrets for his own personal gain.

75.    In addition, as a direct and proximate result of Mr. Prasatik's breach of his fiduciary duties, Plaintiffs have suffered damages and injury whereas Mr. Prasatik received benefits and gains.  Plaintiffs seek to recover their actual and exemplary damages caused by Mr. Prasatik's

breach of his fiduciary duties, and also seek a constructive trust on any funds or property interests that Mr. Prasatik obtained as a result of his breach, as well as an order requiring that he disgorge all profits, compensation, gains, and assets—including real property interests—that he received as a result of breaching his fiduciary duties.

**D.      Breach of Contract—Defendant Prasatik**

76.      Plaintiffs incorporate Paragraphs 1 - 75 as if set forth in full.

77.      The contracts associated with Defendant Prasatik's employment—including the Intellectual Property Agreement that he executed, and the Standards of Business Conduct (which include the Conflicts of Interest Policy and Corporate Assets Policy) that he attested to reading and complying with on an annual basis—are valid and enforceable agreements between Mr. Prasatik and Plaintiffs.

78.      These contracts are necessary and essential for Plaintiffs' legitimate business interests (e.g., protecting Plaintiffs' trade secrets, goodwill, and business relationships) and do not impose undue hardship on Mr. Prasatik.

79.      Mr. Prasatik has materially breached these contracts.  For example, Mr. Prasatik breached the Intellectual Property Agreement and Corporate Assets Policy by using and disclosing Plaintiffs' confidential information—such as information regarding Plaintiffs' royalty owners whose accounts were in suspense or escheat status, and information regarding Plaintiffs' future development plans (which information was not in the public domain)—for purposes unrelated to his employment.  As another example, Mr. Prasatik breached the Conflicts of Interest Policy by using and disclosing Plaintiffs' confidential information to acquire and/or seek to acquire real property interests in areas that Plaintiffs had targeted for current and future development, thereby becoming a competitor of Plaintiffs who were also seeking to acquire interests in these areas.

80.    Plaintiffs have suffered damages and injuries as a direct and proximate result of Mr. Prasatik's material breach of these contracts.  Plaintiffs' damages and injuries include both monetary damages and irreparable harm for which there is no adequate legal remedy (including, without limitation, undermining relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to Plaintiffs' reputation).  Thus, Plaintiffs seek their actual damages, attorneys' fees, and costs resulting from Mr. Prasatik's breach, and also seek temporary, preliminary, and permanent injunctive relief.

E.    **Texas Harmful Access by Computer Act ("THACA," Tex. Civ. Prac. & Red. Code § 143.001)—Defendant Prasatik**

81.    Plaintiffs incorporate Paragraphs 1 - 80 as if set forth in full.

82.    Defendant Prasatik knowingly and intentionally accessed Plaintiffs' computers, computer networks, and computer systems without the Plaintiffs' effective consent.  For example, Mr. Prasatik accessed Plaintiffs' computers, networks, and systems for purposes unrelated to his employment responsibilities to personally benefit himself and his co-Defendants (e.g., to identify royalty interests in suspense/escheat status and then target those interests for purchase, and to obtain legal forms/templates to consummate said purchases) in violation of Plaintiffs' policies regarding conflicts of interest and the treatment of confidential information.

83.    Defendant Prasatik also knowingly and intentionally accessed Plaintiffs' computers, computer networks, and computer systems without the Plaintiffs' effective consent and with the intent to defraud or harm another.  For example, Mr. Prasatik accessed Plaintiffs' computers, networks, and systems to identify royalty interests in suspense/escheat status and then sought to purchase those interests at less than their fair market value, while concealing that he was employed by Plaintiffs and failing to disclose the amount of suspended/escheated royalties associated with those interests.

84.    As a result of Mr. Prasatik knowingly and intentionally accessing Plaintiffs' computers, networks, and systems without the Plaintiffs' effective consent (including for the purpose of defrauding or harming others), Plaintiffs have been harmed and seek to recover their actual damages, reasonable attorneys' fees, and costs.

## F.    Civil Conspiracy—All Defendants

85.    Plaintiffs incorporate Paragraphs 1 - 84 as if set forth in full.

86.    All of the misconduct referenced herein was conducted pursuant to an agreement or understanding between the Defendants to misappropriate Plaintiffs' confidential trade secrets and commit the torts, breaches of contract, and statutory violations asserted herein.

87.    Each of the Defendants engaged in one or more unlawful or tortious overt acts in furtherance of the conspiracy, or used tortious or unlawful means to accomplish acts that might not otherwise be illegal.  For example, Defendant Prasatik misappropriated information regarding Plaintiffs' royalty owners whose accounts were in suspense and/or escheat status and then contacted those royalty owners in an effort to acquire their interests.  Defendant Hutchins formed Defendant Icon Minerals (Ex. 3 ¶ 4(c); Ex. 3-F), which all Defendants would use as the vehicle for acquiring interests from Plaintiffs' royalty owners (Exs. 3-A, B, & C).  Defendant Michaiel conducted a cash flow analysis to determine how much Defendants should offer (Ex. 3 ¶ 5; Ex. 3-G) and also reviewed and revised an offer letter (Ex. 3 ¶ 5; Ex. 3-H) for at least some of the interests that Defendants acquired (or attempted to acquire) from Plaintiffs' royalty owners.  Moreover, all of the Defendants are linked—either directly or indirectly—to the conveyance documents associated with the three known instances in which Defendants' purchased interests from Plaintiffs' royalty owners.  *Supra* ¶¶ 31-35 (detailing that the three interests were conveyed to Defendant Icon Minerals, and that the conveyance documents featured addresses associated

Defendants Prasatik, Hutchins, and Michaiel); Ex. 3 ¶ 4(a)-(c).

88.     As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have not only suffered monetary damages, but have also suffered—and will continue to suffer, absent injunctive relief from the Court—other forms of irreparable harm for which there is no adequate remedy at law including, without limitation, undermining relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to their reputation.

89.     There is no adequate legal remedy to prevent the irreparable harm that results from Defendants' ongoing civil conspiracy, thereby necessitating the entry of a temporary, preliminary, and permanent injunctive relief against all Defendants.

## G.    Application for Temporary, Preliminary, and Permanent Injunctive Relief

90.     Plaintiffs incorporate by reference Paragraphs 1-89 as if set forth in full.

91.     As detailed herein and in Plaintiffs' Verified Motion for Temporary Restraining Order, Defendants have maliciously and willfully misappropriated Plaintiffs' trade secrets by wrongfully acquiring, retaining, transmitting, and using said trade secrets without authorization for their own benefit and/or for the benefit of others.  Defendant Prasatik has also breached his fiduciary duties and contractual obligations toward Plaintiffs, and violated the THACA.

92.     Left unabated, Defendants could further reveal or use Plaintiffs' trade secrets (and Prasatik could continue breaching his fiduciary duties and contractual obligations, and violating THACA) to unjustly enrich themselves while disadvantaging and injuring the Plaintiffs and others. For example, Defendants could continue using information regarding Plaintiffs' current and future development plans to compete with Plaintiffs in acquiring property interests in areas of future development, use Plaintiffs' legal forms and templates to acquire property interests, and/or use

information regarding Plaintiffs' royalty accounts in suspense or escheat status in an effort to purchase the associated royalty interests at lowball values. Defendants could also share Plaintiffs' trade secrets with others, which could cause substantial competitive harm to Plaintiffs (e.g., if Plaintiffs' future development plans were shared with its competitors, it could make it difficult or impossible for the Plaintiffs to profitably execute those plans).

93.     Defendants' conduct results in irreparable harm to Plaintiffs for which there is no adequate remedy at law including, without limitation, undermining relationships between Plaintiffs and their royalty interest owners, loss of business opportunities and goodwill, and damage to their reputation. Such harm is not readily reduced to dollar damages.

94.     There is a substantial likelihood that Plaintiffs will prevail on the merits.

95.     The DTSA and TUTSA explicitly provide for injunctive relief to prevent the "actual or threatened" misappropriation of trade secrets. 18 U.S.C. § 1836(b)(3); Tex. Civ. Prac. & Rem. Code § 134A.003.

96.     The threatened injury to Plaintiffs outweighs any possible damage to Defendants. Indeed, there is no damage to Defendants as injunctive relief simply requires that they stop violating their legal obligations.

97.     The public interest is also served by injunctive relief, as protecting a party's confidential information from misappropriation serves the public interest, whereas allowing such misappropriation to continue unabated does not.

98.     Thus, Plaintiffs request a temporary restraining order to maintain the status quo until the hearing on Plaintiffs' request for a preliminary injunction. Plaintiffs further request that the Court establish a preliminary injunction hearing date and, following notice and the hearing, issue a preliminary injunction that will last until a trial on the merits. Following said trial, Plaintiffs

request a permanent injunction.

99.    Specifically, Plaintiffs request that the Court:

a.    Issue a temporary restraining order requiring Defendants to immediately return all confidential, proprietary, and trade secret information belonging to Plaintiffs that is within their possession, custody, or control, including—but not limited to—all information, files, and records relating to Plaintiffs' current or future development plans, actual, suspected, or potential royalty interests owners, legal forms and templates, contracts (draft or executed), and title and ownership research, including any such information as it may exist in hardcopy, electronic, or digital form or reside on any computers, servers, flash drives, electronic storage devices, Sharefiles, Dropboxes, cloud-based accounts, and/or other devices;

b.    Issue a temporary restraining order prohibiting Defendants from possessing, disclosing, or using all confidential, proprietary, and trade secret information belonging to Plaintiffs that is within their possession, custody, or control;

c.    Issue a temporary restraining order prohibiting Defendants from contacting or entering into any transactions with any of Plaintiffs' actual, suspected, or potential royalty interest owners (including any heirs, descendants, and/or devisees of Plaintiffs' actual, suspected, or potential royalty interest owners);

d.    Issue a temporary restraining order prohibiting Defendants from acquiring any real property interests (including, but not limited to, any fee, mineral, royalty, or surface interests) in any areas in which Plaintiffs are currently developing oil or gas and/or plan on developing oil and/or gas in the future, specifically including Eddy and Lea Counties in New Mexico; the Delaware Basin; the Midland Basin; Regan, Upton, Midland, Glasscock, Martin and Howard Counties in Texas; the Bakken Field in North Dakota, or in any other areas identified in any of the misappropriated materials;

e.    Issue a temporary restraining order requiring Defendants to make available, within 48 hours, for forensic imaging any and all computers, cell phones, servers, flash drives, electronic storage devices, Sharefiles, Dropboxes, cloud-based accounts, and/or other devices that contain (or did, at any point, contain) any of Plaintiffs' confidential information, data, or materials;

f.    Issue a temporary restraining order prohibiting Defendants from deleting or destroying any of Plaintiffs' confidential information, data, or materials unless and until such information is returned to Plaintiffs or preserved through forensic imaging as contemplated by Subparagraph (e);

g.    Issue a preliminary injunction enjoining and restraining Defendants from the conduct set forth in this Paragraph pending a trial on the merits; and

h. Issue a permanent injunction enjoining and restraining all Defendants from the conduct set forth in this Paragraph.

## VI.  Jury Demand

100. Plaintiffs demand a jury.

## VII. Prayer

For those reasons stated herein, Plaintiffs Exxon Mobil Corporation and XTO Energy Inc. respectfully request that the Court: (1) order the temporary and preliminary injunctive relief requested above; (2) following trial on the merits, issue a judgement for monetary damages and permanent injunctive relief; and (3) grant Plaintiffs any additional further relief, at law or in equity, to which they may be entitled as a result of Defendants' wrongful conduct.

Respectfully submitted,

MCGINNIS LOCHRIDGE LLP

By: */s/  Seth Isgur*
Seth Isgur
State Bar No. 24054498
SDTX Federal Number 918729
sisgur@mcginnislaw.com
Marla Broaddus
State Bar No. 24001791
SDTX Federal Number 36031
mbroaddus@mcginnislaw.com
Christopher L. Halgren
State Bar No. 24069859
SDTX Federal Number 1062824
chalgren@mcginnislaw.com
609 Main Street, Suite 2800
Houston, Texas 77002
Tel.: (713) 615-8500
Fax: (713) 615-8585

**ATTORNEYS FOR PLAINTIFFS EXXON MOBIL CORPORATION AND XTO ENERGY INC.**

27

## <u>VERIFICATION</u>

Plaintiffs' Verified Original Complaint and Application for a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction  are verified through the Declarations that are attached as Exhibits thereto.